The following constitutes the
Memorandum Decision of the Court.
Signed July 07, 2011

_____
William J. Lafferty, III
U.S. Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| In re: | Case Number: 09-71902WJL |
| Eduardo Laparan Narvaez and Zenaida Alcantara Narvaez, | Chapter: 7 |
| Debtor(s). | |
| Kathy McGrath, | A.P. No. 10-4040 |
| Plaintiff(s), | |
| Eduardo Laparan Narvaez and Zenaida Alcantara Narvaez, | |
| Defendant(s). | |

**MEMORANDUM DECISION REGARDING ACTION TO DETERMINE NON-DISCHARGEABILITY OF DEBT (11 U.S.C. §523(a)(6))**

Plaintiff Kathy McGrath ("Plaintiff" or "McGrath") brought an action under Section 523(a)(6) of the United States Bankruptcy Code against Defendants (and Chapter 7 debtors) Zenaida and Eduardo Narvaez ("Defendants" or "Narvaezs") seeking a determination that certain alleged damage to a house Plaintiff rented to Defendants is non-dischargeable, as resulting from willful and malicious injury to Plaintiff's property. The matter came on for trial on June 13, 2011. Plaintiff appeared *pro se*. Defendants did not appear. For the reasons set forth below, the Court determines

that $2,770 of the damages asserted by Plaintiff are non-dischargeable pursuant to the provisions of Section 523(a)(6).

**FACTS**

In October 2008, the Narvaezs rented a house located at 2900 Minert Road, Concord, California (the "Property") from Plaintiff. The parties executed a written lease providing for a one year term, beginning on October 18, 2008 and terminating on October 17, 2009, a monthly rent of $2,305, and a security deposit in the amount of $2,300. The lease also contained numerous covenants concerning Narvaezs' obligation to maintain the Property. For a number of reasons, McGrath and Narvaezs agreed to an early termination of the lease, effective as of April 30, 2009.

At trial, George Grockett, Plaintiff's contractor, testified that he visited the Property in November 2008, shortly after Defendants moved in, to respond to complaints from the Defendants concerning the operation of the hot-water heater and the clothes dryer. While on the premises, Mr. Grokett noticed that someone had removed the "popcorn" texture of the ceiling surface from every room in the house except for the master bedroom. Mr. Grokett testified that based on his experience as a contractor he believed that it was likely that someone had first "steamed" and then scraped the ceiling surface to achieve this result. Mr. Grokett also noticed that a built-in bookcase, which apparently "connected" the area between two rooms in the house, had been removed, presumably to facilitate easier access to the affected rooms.

Mr. Grokett further testified that he and Plaintiff jointly inspected the Property on March 12, 2009, in connection with further complaints by the Defendants about the conditions there. During that inspection, Grokett and Plaintiff again noted that the popcorn surface of the ceilings had been removed, that the built-in bookcase was missing, and also that excessive amounts of water collected on the surface of the wooden Vanity in the bathroom, which appeared to be causing the top surface and the drawers of the Vanity to warp. Plaintiff communicated her concerns about this condition to Defendants in a letter, and urged them to prevent further damage to the Vanity by simply mopping up excess water from the Vanity surface and drawers after use of the shower. Plaintiff's Trial

Exhibit No. 5. When Grokett came out to the Property on March 26, 2009 for a follow-up inspection, he found that the condition of the Vanity had worsened materially. Plaintiff's Trial Exhibit No. 6.

At around the time of the March 26 follow-up inspection, Defendants indicated their desire to terminate the lease early and vacate the Property. Plaintiff and Defendants reached an agreement concerning early termination of the Lease, effective as of April 30, 2009. After the Defendants vacated the Property in April 2009, Grokett and Plaintiff conducted a more thorough inspection, and noted damages or necessary clean-up and repairs, and communicated these findings to Defendants in a letter dated April 25, 2009. Plaintiff's Trial Exhibit No. 10.

Plaintiff summarized for the Court the repairs she caused to be made to the Property, and her other alleged damages, as follows:

| Item | Amount |
|---|---|
| Rebuilding Vanity | $120 |
| Repairing Stripped Ceilings | $2,300 |
| Repairing Tile Damage | $140 |
| Cleaning and Repairing Stove, Hood, Dishwasher | $180 |
| Repainting Room | $175 |
| Repairing Damaged Doors and Walls | $75 |
| Steam Cleaning Carpets | $345 |
| Landscaping, Weeding and Mowing | $225 |
| Dismantling Abandoned Structure | $145 |
| Hauling Rubbish | $61 |
| Painting and Patching Walls | $100 |

| | |
|---|---|
| Miscellaneous Supplies | $521 |
| Checking Mildew | $225 |
| Repairing Sprinkler System | $65 |
| Missing Built-in Bookshelf | $350 |
| Serving Papers | $300 |
| Unpaid Rent | $2,035 |
| Unpaid Garbage Bill | $140 |
| Late Fees | $160 |
| Witness Fees | $250 |
| Process Server Fees | $300 |
| Legal Consultation Fees | $150 |
| <u>Total</u>: | $8,363 |

Subtracting the security deposit, which Plaintiff testified that she applied to her expenses prior to the commencement of Defendants' bankruptcy case, the "balance due" was $6,063.

The Narvaezs filed their Chapter 7 petition on December 11, 2009, and on February 12, 2010, Plaintiff filed this adversary proceeding requesting the Court to find all of the above-cited damages non-dischargeable under Bankruptcy Code section 523(a)(6).

## DISCUSSION

Section 523(a)(6) of the Code excepts from discharge any debt "for willful and malicious injury to another entity or to the property of another entity."

In order for an injury to be "malicious" it must result from (1) a wrongful act, (2) done intentionally, (3) which necessarily causes injury, and (4) is done without just cause or excuse. *Ormsby v. First Am. Title Co. (In re Ormsby)*, 591 F.3d 1199, 1207 (9th Cir. 2010). In order for an injury to be "willful", the Court must determine that the defendant intended not only to do the act from which the harm results, but also to injure the plaintiff. *Kawaauhau v. Geiger*, 523 U.S. 57, 61-62 (1998). Controlling Ninth Circuit authority states that the court needs to apply a "subjective" test in determining whether a defendant actually intended to harm the plaintiff, but that such test is satisfied where the debtor had "actual knowledge that harm to the creditor was substantially certain". *Carillo v. Su (In re Su)*, 290 F.3d 1140, 1145-46 (9th Cir. 2002).

In applying these standards to the case of a landlord injured by a tenant's harm to leased premises, courts have required something more than an injury to property resulting from a breach of a lease covenant, such as an obligation to maintain premises in good condition, or even injury to property that arises from a tenant's apparent neglect of potentially harmful conditions. *Lilledahl v. Kibbee (In re Kibbee)*, 287 B.R. 239, 244 (Bankr. E.D. Mo. 2002). On the other hand, where damage occurs from the affirmative, wrongful and otherwise unexcused act of a tenant, and it is at least substantially certain that harm to the property will result, courts have typically found that the injuries were willful and malicious in the sense required by Section 523(a)(6), and have determined such damages to be non-dischargeable. *First Republic Bank v. Christian Mirner (In re Mirner)*, No. 10-4009 AT, 2010 Bankr. LEXIS 2120, at *10-11 (Bankr. N.D. Cal. 2010), *aff'd on other grounds*, BAP No. NC-10-1289-HBaJu, 2011 Bankr. LEXIS 2068 (B.A.P. 9th Cir. 2011). And, in at least some instances, courts have found liability under Section 523(a)(6) where tenants have failed to act to *prevent* damage that was clearly foreseeable and easily preventable, particularly where the bulk of the damage occurred after the relationship between the landlord and tenant had "worsened." *O'Brien v. Sintobin (In re Sintobin)*, 253 B.R. 826 (Bankr. N.D. Ohio 2000).

Applying those standards to this case, the Court concludes that most of the damages requested do not fit within the requirements of Section 523(a)(6). Some of these items do not result from any damage to the Property itself (e.g., unpaid rent, late fees, unpaid garbage bills, legal

consultation, witness and process server fees), and some result from matters that appear to fall within the typical clean-up and repair expenses that normally arise in landlord-tenant relations (repainting room, repairing damaged doors and walls, steam-cleaning carpets, cleaning and repairing stove, hood and dishwasher, painting and patching walls, checking mildew, repairing sprinklers, landscaping, weeding and mowing, hauling rubbish, repairing tile damage, dismantling an abandoned structure, and miscellaneous supplies). That is not to say that such expenses do not arise from breaches of a lease, or can not be claimed as damages by a landlord, or be partially satisfied by an offset against a security deposit that the landlord held against potential cleanup and repair expenses, as McGrath did here prior to the commencement of this case. But the law requires more to determine that debts are non-dischargeable.

However, the Court does conclude that three items of damages, the damage to the surface of the ceilings and the ceiling sheetrock, the damage to the built-in bookshelf and the damage to the bathroom Vanity all do come within the provisions of Section 523(a)(6) and are non-dischargeable. The first two items, damage to the ceiling and damage to the built-in bookshelf, clearly result from the wrongful and unexcused actions of the Defendants. With respect to the ceilings, Grokett testified that in order to remove the "popcorn" texture to the ceilings, someone would have had first to apply steam to the ceiling areas, and then scrape the surface of the ceilings in every room affected. With respect to the bookshelf, the same witness testified that the bookshelf had been removed in a manner that made its reinstallation impossible–worse, rather than having carefully stored the bookshelf in a covered area so that some other use might have been made of it, it had been left outside in the backyard, perhaps for months, and was entirely useless when discovered there after the Defendants had moved out. In both of these instances, the actions of the Defendants were clearly purposeful, wrongful, without excuse, and substantially certain to cause harm to McGrath's property.

Although the damage to the bathroom Vanity is arguably a closer call, because it resulted more from neglect of a potentially harmful condition (water build-up on the wood surface of the Vanity after use of the shower) than an affirmative bad act, the uncontradicted testimony is that the

contractor observed the dangerous condition in mid-March 2009, and Defendants were clearly warned that failure to take extremely simple remedial steps (wiping up excess water) would inevitably lead to damage to the wood surface of the Vanity. That sort of neglect of a simple task, after an explicit warning by the landlord, and after the landlord-tenant relationship had begun to sour, makes this damage wrongful, unexcused and substantially certain to occur, and therefore non-dischargeable as well.

For all of the foregoing reasons, the Court will enter Judgment for the Plaintiff in the amount of $2,770, which the court determines to be non-dischargeable under Section 523(a)(6) of the Code.

# COURT SERVICE LIST

Zenaida Alcantara Narvaez
Eduardo Laparan Narvaez
2306 Woodhill Drive
Pittsburg, CA 94565

Kathy McGrath
230 Keats Cir
Pleasant Hill, CA 94523

Office of the U.S. Trustee
1301 Clay St. #690N
Oakland, CA 94612